IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| WILLIAM F. MANUEL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No.  00 C 0679 |
| v. | ) |
| | ) Judge Robert W. Gentleman |
| TIMOTHY BUDZ (in his individual capacity), | ) |
| JOHN HARGIS (in his individual capacity), | ) |
| RAYMOND WOOD (in his individual capacity), | ) |
| SHAN JUMPER (in his individual capacity), and | ) |
| MARGARET FARLEY (in her individual capacity), | ) |
| | ) |
| Defendants. | ) |

## **MEMORANDUM OPINION AND ORDER**

Plaintiff William F. Manuel filed a first amended complaint[1] against employees of the Sexually Violent Persons ("SVP") Unit of the Sheridan Correctional Facility, alleging violations of his civil rights under 42 U.S.C. § 1983. Defendants filed a motion to dismiss plaintiff's complaint for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). For the reasons stated below, the motion to dismiss is denied.

## **FACTS**[2]

Plaintiff has been civilly committed to the custody of the Illinois Department of Human Services ("DHS") pursuant to the Illinois Sexually Violent Persons Commitment Act, 725 ILCS

---

[1]This action had been assigned to Judge Leinenweber in April 2000 with several other cases alleging claims concerning access to the Sheridan Correctional Facility law library. The case was assigned to this court in November 2005, counsel was appointed in January 2006, and the amended complaint was filed June 27, 2006.

[2]The facts recited herein are those alleged in the complaint which, for purposes of a Rule 12(b)(6) motion, the court accepts as true. Travel All Over the World, Inc. v. Kingdom of Saudi Arabia, 73 F.3d 1423, 1428 (7th Cir. 1996).

207/1 et seq. For the period referenced in his complaint, plaintiff was housed in the Sexually Violent Persons Treatment and Detention Facility ("TDF") of the Sheridan Correctional Center.

On the morning of October 23, 1999, approximately 63 TDF residents gathered in the exercise yard to discuss their dissatisfaction with their treatment plans, work assignments, and ability to move through the facility without restraints. Plaintiff did not participate in the discussions and "limited his involvement to listening." During this meeting, all residents were closely monitored by several Security Therapeutic Aides ("STAs"). According to plaintiff, the residents made no threat of imminent disruption or violence, and at no point did plaintiff voice his concerns. At the end of the meeting, plaintiff returned to his room and had no further discussions with other residents regarding the meeting. He did not participate in any future plans or meetings regarding the residents' concerns.

For the remainder of the day, the residents exhibited no riot- or strike-related conduct and showed no aggression toward facility officials. Later that evening, however, two residents fought in the dining hall. Plaintiff did not participate in the fight in any way. After the fight, defendants Budz, Hargis, and Wood placed all residents on Secure Management Status ("SMS"), or "lock-down."

On the morning of October 24, 1999, an STA came to plaintiff's room and removed plaintiff's personal electronic devices and revoked his commissary privileges. The STA told plaintiff he was taking these actions because plaintiff actively participated in plans to incite a riot and engaged in threatening behavior toward STA staff members. Plaintiff requested an opportunity to discuss this decision with members of the Behavioral Management team, including defendants Jumper and Farley, but the team denied his request.

On or about October 26, 1999, defendant Jumper prepared a Behavior Management

Meeting report, which outlined plaintiff's alleged conduct at the October 23, 1999, meeting. This report recommended that plaintiff remain on SMS. Plaintiff did not receive a copy of this report until on or about November 12, 1999, after he had been on SMS for three weeks.

On October 28, 1999, defendants Budz, Hargis, and Wood ordered plaintiff to submit to an interview. Plaintiff was escorted to his interview in handcuffs, where an STA asked him about his role in the October 23, 1999, meeting and to provide names of the meeting's leaders. Plaintiff stated that he did not participate actively in the meeting and did not engage in any threatening or abusive behavior toward any staff on duty that day. He also stated that all residents acted peacefully during the meeting. Plaintiff asked the staff members present at his interview to consult with the STA who viewed his behavior during the October 23 meeting, but according to plaintiff, defendants never spoke with this STA.

On or about November 5, 1999, defendants Budz, Hargis, and Wood authorized staff to move plaintiff and ten other residents to "3-Hall," another area of the Sheridan facility. Staff members told plaintiff he was being moved because he was a leader at the October 23 meeting, he had tried to incite a riot, and other residents were afraid of him.

On or about November 16, 1999, defendant Farley, plaintiff's primary clinical therapist, visited plaintiff in his room. Plaintiff alleges that defendants Wood and Jumper instructed defendant Farley to visit plaintiff. During the visit, defendant Farley pressured plaintiff to provide information about the October 23 meeting. Plaintiff told defendant Farley that he was not an active participant in the meeting. On November 23, defendant Farley visited plaintiff again. She told plaintiff he would not be released from SMS until he signed a statement agreeing to the following conditions: 1) full acknowledgment that he engaged in the behavior that led to SMS; 2) acceptance of personal responsibility for the behavior that led to SMS; 3) acceptance of

all sanctions the Behavioral Committee found appropriate; and 4) no significant behavioral problems during the time on SMS or during the past fourteen days.  Plaintiff refused to sign the statement.  Defendant Farley continued to visit plaintiff through December 13 and asked him to sign the statement, but plaintiff refused.

Plaintiff was released from SMS on December 14, 1999.  At no time did he sign the statement presented to him by defendant Farley or admit to participation in conduct that led to SMS.  While on SMS, plaintiff was: 1) not given access to his personal possessions; 2) given the choice of a daily five-minute shower, to and from which he would be escorted in handcuffs, or a daily 30-minute visit to the dayroom, during which he would be handcuffed; 3) not permitted to leave his room without handcuffs; and 4) required to eat all meals in his room.  Plaintiff attempted to file numerous grievances protesting his SMS, including the denial of commissary privileges and access to his personal property, but according to plaintiff, no official reviewed his grievances.

## DISCUSSION

The purpose of a motion to dismiss is to test the sufficiency of the complaint, not to decide the merits.  Gibson v. City of Chicago, 910 F.2d 1510, 1520 (7th Cir. 1990).  Federal notice pleading requires only that the plaintiff "set out in her complaint a short and plain statement of the claim that will provide the defendant with fair notice of the claim."  Scott v. City of Chicago, 195 F.3d 950, 951 (7th Cir. 1999).  When ruling on a motion to dismiss, the court must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff.  Szumny v. Am. Gen. Fin., Inc., 246 F.3d 1065, 1067 (7th Cir. 2001).

**I. Violation of Plaintiff's Constitutional Rights**

Plaintiff claims that defendants violated his rights under § 1983 by inflicting excessive punishment on him in an unduly harsh and unnecessarily disproportionate manner. Plaintiff does not complain about the initial decision to place him and the other attendees of the October 23 meeting on lockdown to investigate the matter so much as the allegedly punitive continuation of his confinement under harsh conditions for 53 days. As an individual who is civilly committed, rather than incarcerated, plaintiff's claim arises under the Due Process Clause of the Fourteenth Amendment, rather than the Eighth Amendment. Brown v. Budz, 398 F.3d 904, 910 (7th Cir. 2005).[3] The Seventh Circuit, however, applies the Eighth Amendment's deliberate indifference standard to claims involving civilly detained sex offenders because there is "little practical difference" between the standards of review under the Fourteenth and Eighth Amendments. Id. at 910.

The Supreme Court has held that "[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." Youngberg v. Romeo, 457 U.S. 307, 322 (1982). Individuals who have been civilly committed, like pre-trial detainees, may "be held for security reasons but not punished." Allison v. Snyder, 332 F.3d 1076, 1079 (7th Cir. 2003). Defendants maintain that they did not punish plaintiff by keeping him in SMS for 53 days. In support of their actions, defendants reference the Seventh Circuit's holding that sexually violent persons may be segregated to restore order and preserve safety. West v. Schwebke, 333 F.3d 745, 748 (7th Cir. 2003). This holding, though, applies only to detainees who are "uncontrollably

---

[3]Plaintiff's complaint and response to defendants' motion to dismiss allege only a substantive due process violation, not a procedural due process violation.

violent, and thus pose a danger to others." Id. Accepting plaintiff's facts as true, there is no indication that he was violent in any manner, let alone uncontrollably so. Plaintiff also asserts that defendants' actions are punitive not only because of the initial decision to place him on SMS, but also the decision to keep him on SMS for an extended period of time without permitting him to explain himself or to file a grievance. Plaintiff has therefore made a sufficient allegation that his placement on SMS was punitive and consequently a violation of his constitutional rights.

Defendants also argue that a civilly detained sex offender has a protectible liberty interest only where a restraint "imposes atypical and significant hardship in relation to the ordinary conditions of his confinement ." Thielman v. Leean, 282 F.3d 478, 484 (7th Cir. 2002). Defendants are incorrect, however, in their assertion that this standard applies to plaintiff. Civil detainees must allege an "atypical and significant hardship" only "[i]n order to state a procedural due process claim." Id. As defendants themselves point out in their reply brief, plaintiff makes only a substantive due process claim, not a procedural due process claim. This standard is therefore inapplicable to the instant matter.

Finally, defendants argue that plaintiff fails to state a claim because the conditions imposed on plaintiff while on SMS did not amount to a substantive due process violation. Once again, defendants cite standards applicable only to prisoners, rather than civil detainees. Plaintiff has alleged that: 1) his movement, privileges, and access to personal property were improperly restricted; 2) he was not given the opportunity to challenge his confinement; and 3) facility staff members ignored his attempts to file grievances. Such allegations are sufficient to state a claim for violation of his due process rights under § 1983.

**II. Liability of Defendants**

Plaintiff sues Budz, Hargis, Wood, Jumper, and Farley in their individual capacities. To impose individual liability under § 1983, plaintiff must allege that each defendant caused or participated in the constitutional deprivation at issue. Gentry v. Duckworth, 65 F.3d 555, 561 (7th Cir. 1995). In other words, plaintiff's complaint must show a causal connection or an affirmative link between each defendant and the alleged deprivation. Id. To satisfy this requirement, plaintiff may allege that a defendant knew about a deprivation and that he facilitated it, approved it, or turned a blind eye to it. Id.

In his first amended complaint, plaintiff alleges that defendants Budz, Hargis, and Wood placed all residents on SMS and removed plaintiff's electronic devices and commissary privileges. Plaintiff also alleges that defendant Jumper prepared the report on which the decision to place plaintiff on SMS was based. Finally, plaintiff alleges that defendant Farley pressured him to provide information about the October 23 meeting in exchange for release from SMS and told plaintiff he would not be released from SMS until he acknowledged participation in the meeting and accepted the conditions outlined in the statement presented to him. Plaintiff's assertions sufficiently allege that each defendant caused or participated in the deprivation of plaintiff's constitutional rights.

Defendants maintain that defendants Wood, Jumper, and Farley are protected by the professional judgment standard, which applies to them because of their positions and training as sex offender treatment clinicians. Youngberg, 457 U.S. at 321-24. Under this standard, "liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." Id. at 323. As this

court has previously held, "the question of whether professional judgment has in fact been exercised by the administrators of [a sexually violent persons unit of a] facility cannot be resolved on a motion to dismiss." Hargett v. Baker, 2002 WL 1732911, *3 (N.D. Ill. 2002). The court therefore denies defendants' motion to dismiss claims against Wood, Jumper, and Farley based on the professional judgment standard.

Finally, defendants assert that they are entitled to qualified immunity. Under the doctrine of qualified immunity, public officials performing discretionary functions are protected against civil liability if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Wilson v. Formigioni, 42 F.3d 1060, 1064 (7th Cir. 1994) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).

At the time of the conduct at issue, the Illinois Sexually Violent Persons Commitment Act had been in effect for a year and a half. Although the legislation itself was relatively new (and, indeed, no Seventh Circuit case to date has addressed the issue of qualified immunity in connection with this law), defendants knew or should have known of a civil detainee's constitutional rights. At the time of the conduct alleged by plaintiff, the Seventh Circuit had held that civil detainees may not be punished. See, e.g., Allison, 332 F.3d at 1079. Any reasonable staff member working in the SVP unit, therefore, would have known that punishing plaintiff would violate his constitutional rights. On the record as it currently stands, therefore, defendants are not entitled to qualified immunity in this matter.

## CONCLUSION

For the reasons stated above, defendants' motion to dismiss the first amended complaint is denied. Defendants are directed to answer the first amended complaint on or before November 13, 2006. The parties are directed to file a Joint Status Report using this court's form

on or before November 15, 2006. The status report previously scheduled for October 26, 2006, is rescheduled for November 21, 2006, at 9:00 a.m.


**ENTER: October 20, 2006**

                                                                          **Robert W. Gettleman**
                                                                         **United States District Judge**